UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRETT AMORY, JONATHAN DARBY, ALYSSA DENNIS, ALICIA DUBNYCKYJ, SEONNA HONG, VINCENT HORVAT, FALK LEHMANN, SCOTT LISTFIELD, DAVID MARCHAND, HYLAND MATHER, AARON NAGEL-WERD, ADRIAN PALENGAT, JASMINE SIDDIQUI, EUGENE VOSKOBOYNIKOV, and TYRONE WRIGHT,<br><br>    Plaintiffs,<br><br>  v.<br><br>JUSTIN GIARLA,<br><br>    Defendant. | No. C 20-05253 WHA<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

**INTRODUCTION**

Plaintiffs are a group of artists and art buyers who either consigned their artwork or purchased artwork from defendant, a former gallerist, allegedly renowned, with various galleries in San Francisco. They allege that he misappropriated the proceeds from the sale or purchase of artwork entrusted to him for his own personal gain, abruptly closed all of his galleries after exhausting a Ponzi scheme to defraud them, and fled to Oregon with their property, which he held in trust, as a fiduciary. Plaintiffs allege breach of fiduciary duty and

violations of RICO. Defendant now moves to dismiss. To the following extent, defendant's motion is **GRANTED**.

**STATEMENT**

The complaint alleges that plaintiffs are professional artists, their agents and/or managers, or art buyers living in various states, Europe, and Australia (*id*. at ¶¶ 7–21). According to their complaint, "[d]efendant Justin Giarla is a former art gallery owner who rose to prominence within the art world and then used his renown and influence to carry out a deliberate, systemic, years-long campaign to defraud and steal" money and artwork from plaintiffs (*id*. at ¶ 1).

By the early 2000s, defendant had become one of the "best-known gallerist on the West Coast." Two of his San Francisco art galleries — Shooting Gallery and White Walls Gallery — had helped "bring street art, pop art, and lowbrow art to high art prominence, offering entrée to artists long ignored by fine art galleries." Defendant's galleries hosted some of the most established artists in the field, and defendant gained a reputation as a "kingmaker." His exhibition of upcoming artists' artwork at his galleries led to extreme success, sometimes selling all of the exhibited art in one showing, which generated hundreds of thousands of dollars. Indeed, his success stories helped turn San Francisco into "a mecca for aspiring artists, with many emerging artists moving to the Bay Area for a chance to exhibit with [him]." Even artists from around the world sought to exhibit their art at defendant's galleries. In 2010, defendant further cemented his reputation as one of the most prominent art dealers in the West Coast and as a catalyst to the success of emerging artists by opening his third gallery: 941 Geary (*id*. at ¶¶ 27–31).

In 2011, defendant and his then-wife co-purchased a building located at 866 Geary Street in San Francisco, which apparently housed all three of his galleries. The complaint alleges that defendant devised a Ponzi scheme in order to pay for the building, defrauding and misappropriating funds and artwork from artist and art buyers alike. Defendant's alleged plan was to hold the building long enough for it to appreciate in value, sell it for a profit, and then "use the proceeds to escape liability and accountability" (*id*. at ¶¶ 32, 39). The complaint

alleges that defendant did just that, that is, he misappropriated hundreds of thousands of dollars from the sale of plaintiffs' artworks, sold the building in 2016 for $3.3 million, abruptly closed all three of his galleries without notifying artists or creditors, and absconded to Oregon with plaintiffs' monies and artworks (*id*. at ¶¶ 22, 45).

In order to effectuate his scheme, defendant used his charisma and status as a renowned art dealer with the power to derail an artist's career, and "employed various tactics to prevent or delay discovery of his illegal acts." For instance, defendant would: (1) ignore the calls and emails of artists to whom he owned money to; (2) state that he was experiencing financial hardship or going through a divorce and would pay them as soon as he was able; (3) "bounce checks or simply lie and tell artists that he had mailed them a check or initiated a wire transfer when in fact he had not"; and/or (4) make a partial payment. In some instances (*id*. at ¶ 39):

> Defendant coupled the partial payment tactic with a variation on a Ponzi scheme in which he used the proceeds from newer sales to pay older debts. Thus, instead of holding sales proceeds in trust for the benefit of individual artists as he was required to do under the law, Defendant would misappropriate those funds for his personal use, including to fund his purchase of 886 Geary. Then, when an artist complained about his failure to pay, Defendant would divert funds from a recent sale of work by a second, unrelated artist to make a partial payment to the first artist. This allowed Defendant to temporarily appease the first artist, and when it came time for the second artist to complain about non-payment, Defendant would repeat the scheme with a third artist, and so on.

The complaint alleges that defendant employed partial-payment tactics in situations where an artist would persist in her collection efforts or where defendant "thought they might take legal action against him or publicize his failure to pay" (*id*. at ¶ 38). The complaint alleges that defendant's intentions in making partial payments were threefold: (1) to buy him more time to further his scheme; (2) reduce the likelihood that a creditor would publicly expose him; and (3) conceal "the fact that Defendant never intended to pay the artist in full" (*ibid*.).

All of the artist plaintiffs who consigned artwork to defendant did so pursuant to agreements where defendant would receive a fifty percent commission from the sale of their paintings. The complaint alleges that the earliest any of the plaintiffs learned of their injury

was on or about July 31, 2016, when a viral Facebook post alerted them to the fact that defendant had abruptly and surreptitiously closed his galleries while still in possession of their paintings, money, or both (*id.* at ¶¶ 49, 59, 67, 112, 129, 135, 143, 153); (*see also* Hashimoto Decl. ¶ 5, Exh. A).

Here follow the individual allegations pertaining to each plaintiff. When not stated, the aforementioned Facebook post was the first plaintiffs learned that defendant had closed his galleries, and when they first allege to have realized that defendant had no intention of paying them, in full, for their sold paintings and/or returning their unsold paintings to their possession.

### 1. VINCENT HORVAT.

Horvat is an art collector based in Australia. In January 2016, Horvat paid defendant $4,500 for a painting by artist William Chad Willsie. In May 2016, Horvat learned that defendant was planning to close his galleries, so he inquired about the delivery of the painting he had purchased. In an email, defendant told Horvat that the cost of shipping had increased. Horvat informed defendant that he would personally pick up the purchased painting during his next visit to San Francisco. After defendant closed his galleries, Horvat found out that defendant had returned the already-purchased painting to Willsie, the artist, in or about June 2016, telling Willsie that his painting had not sold. The complaint alleges that Horvat first realized that defendant had no intention of giving him the painting he had paid for on or about July 31, 2016, and that he is owed the $4,500 purchase price (*id.* at ¶¶ 102–107).

### 2. DAVID MARCHAND.

Marchand is an art collector based in Los Angeles. In 2011, Marchand paid defendant a total of $8,400 for three paintings. The complaint alleges that Marchand "agreed that [d]efendant could temporarily keep" the three paintings "in his possession and store them for the benefit of Mr. Marchand." Subsequently, in February 2017, Marchand learned that, unbeknownst to him, defendant had resold one of the paintings, as it had been spotted at a hotel restaurant in Las Vegas. The complaint alleges that Marchand is owed $8,400 (*id.* at ¶¶ 114–117).

### 3. BRETT AMORY.

Amory is an artist based in Oakland. In 2011, he delivered two original paintings to defendant for exhibition and sale on a consignment basis. Defendant exhibited Amory's two paintings at his 941 Geary Gallery for three weeks in April 2011. After the exhibition, defendant did not return Amory's artworks, nor did he inform Amory that his artworks were sold. Subsequently, however, Amory learned that defendant had in fact sold one of his paintings for seven thousand dollars during the exhibition (*id.* at ¶¶ 54–58). The complaint alleges that Amory is owed $3,500 for the sold painting and thirteen thousand dollars for the unsold painting, representing its fair market value (*id.* at ¶ 60).

### 4. JONATHAN DARBY.

Darby is an artist based in the United Kingdom. In 2012, he delivered seven original paintings to defendant for exhibition and sale on a consignment basis. Defendant exhibited Darby's seven paintings at his White Walls Gallery from November 2012 to December 2012. Defendant sold four of Darby's paintings during the exhibition for a total of $19,300. In January 2013, Darby sent defendant multiple emails inquiring about the payments for his sold work, as well as the return of his unsold work. In December 2013, defendant paid Darby a partial payment of $2,700 (*id.* at ¶¶ 61–66). The complaint alleges that Darby is owed $6,950 for the sold paintings and $8,650 for the unsold paintings, representing their fair market value (*id.* at ¶ 68).

### 5. ALYSSA DENNIS.

Dennis is an artist based in New York. In 2015, Dennis delivered several original paintings to defendant for exhibition and sale on a consignment basis. Defendant exhibited Dennis' paintings at his White Walls Gallery from April 2015 to May 2015. Defendant sold one of Dennis' paintings during the exhibition for two thousand dollars. Subsequently, Dennis sent defendant multiple emails inquiring about payment for her sold painting. Eventually, defendant offered to pay Dennis in five monthly installment payments of two hundred dollars. After Dennis emailed defendant about his default on the second monthly installment payment, defendant emailed Dennis back on December 9, 2015, stating that: "check is in the mail."

1    Dennis, however, never received a check in the mail, so she emailed defendant again in
2    January 2016.  Defendant responded on January 5, 2016, stating: "yeah working on it. . . I
3    haven't sold anything in weeks so I don't wanna [sic] send a bad check. . . hopefully this
4    week" (*id*. at ¶¶ 69–77) (ellipsis in original).

   Moreover, under the terms of their agreement, defendant had agreed to pay for the shipping cost of returning the unsold artwork to Dennis.  But defendant refused to do so.  Dennis thus spent $1,371 to collect and ship back her unsold artwork.  The complaint alleges that Dennis is owed eight hundred dollars for the sale of her painting and the $1,371 she spent to ship back her unsold artwork (*id*. at ¶¶ 78–79).

### 6. ALICIA DUBNYCKYJ.

Dubnyckyj is an artist based in the United Kingdom.  In 2014, she delivered an original painting to defendant for exhibition and sale on a consignment basis.  Defendant exhibited Dubnyckyj's painting at his White Walls Gallery from May 2014 through July 2014.  Defendant never informed Dubnyckyj whether or not her painting had been sold, nor did he ever return it.  The complaint alleges that it was not until November 2016 that "Dubnyckyj learned that [d]efendant had closed the Galleries and sold the building where they were located.  It was at that time that [she] first realized that [d]efendant had no intention of returning" her artwork to her possession.  The complaint alleges that Dubnyckyj is owed $6,250, representing the fair market value of her painting (*id*. at ¶¶ 80–85).

### 7. JASMINE SIDDIQUI & FALK LEHMANN.

Siddiqui and Lehmann are artists based in Germany.  They work together under the pseudonym "Herakut."  In 2013, they delivered seventeen original paintings to defendant for exhibition and sale on a consignment basis.  Defendant exhibited the Herakut paintings at his White Walls Gallery from November 2013 through December 2013.  Defendant sold various of the Herakut paintings for a total of approximately $123,040 (*id*. at ¶¶ 86–89).

In March 2014, defendant paid Siddiqui and Lehmann $3,500 each.  Thereafter, they repeatedly tried to collect the remaining amounts owed to them from the sale of the Herakut paintings.  Each time, defendant would tell them that he was experiencing financial difficulty

6

"related to his divorce proceedings and that he would pay" them "when he was able to." Then, in August 2016, Siddiqui and Lehmann learned that defendant had closed his galleries. Concerned that defendant did not intend to pay them the remaining proceeds, they again contacted defendant. In September 2016, defendant paid each of them an additional two thousand dollars. The complaint alleges that Siddiqui and Lehmann are owed $50,550, representing the fair market value of the Herakut paintings (*id.* at ¶¶ 91–95).

### 8. SEONNA HONG

Hong is an artist based out of Los Angeles. In 2014, she delivered a painting to defendant for exhibition and sale on a consignment basis. Defendant exhibited her painting from May 2014 through July 2014 at his White Walls Gallery. Thereafter, defendant never informed Hong whether or not her painting had been sold, nor did he ever return it. The complaint alleges that it was not until November 2016 that "Hong learned that [d]efendant had closed the Galleries and sold the building where they were located. It was at that time that [she] first realized that [d]efendant had no intention of returning" her artwork to her possession. The complaint alleges that Hong is owed $2,800, representing the fair market value of her painting (*id.* at ¶¶ 96–101).

### 9. SCOTT LISTFIELD.

Listfield is an artist based in Massachusetts. In December 2015, Listfield delivered two original paintings to defendant for exhibition and sale on a consignment basis. Defendant sold both of Listfield's paintings for a total of $5,400. In May 2016, Listfield attempted to contact defendant about obtaining payment but received no response. The complaint alleges that he is owed $2,700 (*id.* at ¶¶ 108–113).

### 10. HYLAND MATHER.

Mather is the agent and manager of artist Amanda Marie Ploegsma who has "assigned all ownership, title, and rights to her claims asserted herein to Mr. Mather." In January 2014, Ploegsma delivered 36 original paintings to defendant for exhibition and sale on a consignment basis. During the exhibition, defendant sold sixteen of Ploegsma's paintings for an approximate total of $27,400. In February 2014, defendant made a two-thousand-dollar partial

7

payment to Ploegsma. For months thereafter, Mather tried to collect the remainder of the proceeds owed to Ploegsma, but to no avail. In January 2015, defendant agreed to monthly installment payments of one thousand dollars and repeatedly assured Mather that the first installment payment was forthcoming (*id.* at ¶¶ 118–126).

Then, on February 12, 2015 (*id.* at ¶ 127):

> Defendant told Mr. Mather via email that he had initiated a wire transfer to Ms. Ploegsma on February 10, 2015. Specifically, he wrote, "I sent it Tuesday, should be there by tomorrow I would imagine. did you get the email from my bank that I sent it?" In fact, when he wrote this email, Defendant had not yet initiated the wire transfer and did not do so until February 16, 2015.

On March 13, 2015 (*id.* at ¶ 128):

> Mather sent an email to Defendant to inquire about the timing of the next installment payment. In response, Defendant wrote, "hey Hyland, hopefully in the next couple weeks... I have a couple openings tomorrow so I might have a better idea after this weekend..."

The complaint alleges that he is owed $10,700 (*id.* at ¶¶ 129–130).

### 11. AARON NAGEL.

Nagel is an artist based in Oakland. In 2011 and 2013, he delivered various original paintings to defendant for exhibition and sale on a consignment basis. Defendant sold five of Nagel's paintings for an approximate total of $19,800. Nagel began inquiring about receiving payment for his sold paintings in August 2013, but received no responses. The complaint alleges that he is owed $9,900 (*id.* at ¶¶ 131–136).

### 12. ADRIAN PALENGAT.

Palengat "is an agent and manager of artist Pakpoom Silaphan" who "has assigned all ownership, title, and rights to his claims asserted herein to Mr. Palengat." In September 2014, Silaphan delivered various original paintings to defendant for exhibition and sale on a consignment basis. During the exhibition at White Walls Gallery, defendant sold one of Silaphan's paintings for sixteen thousand dollars. In November 2014, Palengat contacted defendant regarding payment for the sold painting. The next day, defendant "responded via

email that 'the last 2 months have been devastating to the gallery financially" (*id*. at ¶¶ 137–142).

The complaint alleges that Palengat is owed eight thousand dollars from the sale of the one painting and sixteen thousand dollars for the fair market value of the unsold paintings, which defendant never returned (*id*. at ¶¶ 143–144).

### 13. EUGENE VOSKOBOYNIKOV.

Voskoboynikov "is an agent of artist Georgi Tchkhaidze" who "has assigned all ownership, title, and rights to his claims asserted herein to Mr. Voskoboynikov." In August 2010, Tchkhaidze delivered several original paintings to defendant for exhibition and sale on a consignment basis. During the August 2010 exhibition at White Walls Gallery, defendant sold two of Tchkhaidze's paintings for an approximate total of $9,450 (*id*. at ¶¶ 145–149).

In September 2014, Tchkhaidze emailed defendant regarding payment for the sold paintings and the return of his unsold paintings. They arranged for Voskoboynikov to personally pick up Tchkhaidze's unsold paintings and to collect the payment for the sold paintings on September 17, 2014 (*id*. at ¶¶ 145–151). When Tchkhaidze arrived on that day (*id*. at ¶¶ 151–152):

> Defendant showed him a check made out to Mr. Tchkhaidze but said that instead of giving the check to Mr. Voskoboynikov, Defendant would mail the check to Mr. Tchkhaidze together with the unsold Tchkhaidze Works.
>
> When Mr. Tchkhaidze received the unsold Tchkhaidze Works, there was no check included. On October 2, 2014, Mr. Voskoboynikov again contacted Defendant to inquire about collecting the check in person. On October 8, 2014, Defendant responded via email, stating that he would "cancel the first check I sent and send another check in the mail today." When Mr. Voskoboynikov insisted that he wished to collect the check in person, Defendant responded that he had "already dropped it in the mail 10 minutes ago." Neither Mr. Tchkhaidze nor Mr. Voskoboynikov ever received a check from Defendant.

The complaint alleges that Voskoboynikov is owed $4,725 from the sale of Tchkhaidze's two paintings (*id*. at ¶¶ 153–154).

9

**14.    TYRONE WRIGHT.**

Wright is an artist based in Australia. In 2012, he delivered several original paintings to defendant for exhibition and sale on a consignment basis. During the exhibition, defendant sold eighteen of Wright's paintings for an approximate total of $75,320. In September 2012, Wright sent defendant an invoice for the sold paintings.

In April 2014, defendant paid Wright a partial payment of five hundred dollars and agreed to bi-weekly installments of the same (*id*. at ¶¶ 155–159). On September 7, 2016 (*id*. at ¶ 160):

> [A]fter selling the Galleries, Defendant wrote in an email to Mr. Wright that he "just got some money" and that he could send Mr. Wright an initial payment and then subsequently "get on a monthly payment plan." Defendant wired $2,000 to Mr. Wright and then failed to make any additional payments.

The complaint alleges that defendant owes Wright $29,160 from the sale of his paintings.

\*            \*            \*

Based on the foregoing allegations, on July 30, 2020, plaintiffs instituted this action against defendant alleging: (1) breach of fiduciary duty under California law, Cal. Civ. Code § 1738 *et seq.*; and (2) violations of the civil section of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c). Plaintiffs base their civil RICO claim on defendant's alleged various acts of mail and wire fraud relating to plaintiffs Dennis, Mather, and Voskoboynikov.

Defendant now moves to dismiss for lack of subject-matter jurisdiction. In support, he argues that plaintiffs' civil RICO claim is both time-barred and inadequately pled and there is thus no federal-question jurisdiction. Accordingly, he opposes supplemental jurisdiction over plaintiffs' state-law claim for breach of fiduciary duty, which, in any event, defendant argues is also time-barred. For the reasons stated herein, this order finds that plaintiffs Dennis, Mather, and Voskoboynikov's claims are time barred, at least as currently pled. Accordingly, to the following extent, defendant's motion is hereby **GRANTED**.

# ANALYSIS

### 1. CIVIL RICO CLAIM.

The elements of a civil RICO claim are as follows: "(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activity (known as 'predicate acts'); (5) causing injury to plaintiff's 'business or property.' " *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citation omitted). To plead a 'pattern' of 'racketeering activity,' plaintiffs must show that defendant committed at least two predicate offenses within ten years of each other. *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).

As a threshold matter, defendant contends that every single plaintiff's claim is time barred. The linchpin of the RICO claim centers on defendant's alleged acts of mail and/or wire fraud relating to plaintiffs Dennis, Mather, and Voskoboynikov. If these three plaintiffs' claims are time barred, therefore, there is no civil RICO claim and thereby no federal-question jurisdiction. For the following reasons, this order finds that Dennis, Mather, and Voskoboynikov's claims, as pled, are time barred. The absence of their claims being fatal to plaintiffs' RICO claim, this order does not reach the timeliness of the remaining plaintiffs' claims, but notes that many of them also appear to be time barred. While some of the remaining plaintiffs might well be able to allege facts that would establish tolling, Dennis, Mather, and Voskoboynikov — the only plaintiffs that have supplied the predicate acts for RICO — have not.

The statute of limitations for a civil RICO claim is four years. *See Rotella v. Wood*, 528 U.S. 549, 552 (2000). In *Rotella*, the Supreme Court held that the accrual clock for a civil RICO claim begins when a plaintiff knew or should have known of her *injury*. Notwithstanding that "a pattern of predicate acts may well be complex, concealed, or fraudulent," it is the "discovery of the injury, not discovery of the other elements of a claim" that starts the clock. *Id*. at 553–56. Even so, a civil RICO claim is subject to equitable principles of tolling. *Id*. at 560.

This action was filed on July 30, 2020. Defendant contends that plaintiffs' civil RICO claim is time barred because every plaintiff's "alleged injury, *i.e.*, loss of artwork or money,

occurred more than four years before the filing of this action" and that plaintiffs knew or should have known of their injuries more than four years before the filing of this action (Dkt. No. 25 at 8).

Plaintiffs respond that the consignment of their artwork created a legal trust whereby defendant's galleries held those artworks — and the proceeds from the sale of those artworks — in trust for their benefit. They argue that their claims are not time barred because they "did not know of their injuries, nor should they have known of their injuries, until July 31, 2016, at the earliest, when they first learned via a viral Facebook post that [d]efendant had closed the [g]alleries, unilaterally and improperly terminated his consignment relationship with [them,] and fled California with their funds and/or artwork" (Dkt. No. 27 at 11–12) (citing Dkt. No. 1 at ¶¶ 59, 67, 84, 93, 100, 106, 116, 129, 135, 143, 153). According to them, their injuries lie "in the permanent loss of money and/or artwork owed to them by [d]efendant," which did not occur until defendant severed the consignment trusts by closing the galleries and fleeing to Oregon with their property. They argue that they "had no reason to suspect that anything was amiss until at least" July 31, 2016 (*id*. at 12). "Until then, while the [g]alleries were still open, plaintiffs' property was still held in trust with defendant" and there was no injury, they argue.

Prior to July 31, 2016, plaintiffs contend that they had no reason to suspect that defendant intended not to pay them and/or return their artwork. In support, they point to (1) defendant's success and reputation as one of the best-known gallerist on the West Coast with notoriety among artists throughout the world; (2) to the regularity of receiving late payments from defendant; (3) the commonality of late payments in the industry in general; and (4) to the balance of power and dynamics between artists and galleries: "artists seldom expect prompt payment from gallery sales and generally do not push the issue for fear of straining relationships with gallerists on whom their livelihoods rely" (Dkt. No. 27 at 13). They thus argue that they did not have actual or constructive knowledge of defendant's alleged fraud before July 31, 2016, when the viral Facebook post spurred discussions revealing not only defendant's systemic fraud, but also his abrupt closure of the galleries. For these reasons, plaintiffs contend that the proper accrual date is July 31, 2016, at the earliest. Alternatively,

they argue that their RICO claim should be equitably tolled given defendant's alleged fraudulent concealment. This order disagrees with both of plaintiffs' arguments.

As a preliminary matter, this order notes that though plaintiffs have joined together to share the expense of suit, this is not a class action. It is a joinder of individual plaintiffs in a single suit against a single defendant. Each individual plaintiff's allegations must stand on its own as to both accrual and tolling, if any. Plaintiffs' brief lumps all plaintiffs together and makes no specific arguments as to any individual plaintiff. Instead, plaintiffs generally rely on the viral July 2016 Facebook post and their consignment trust theory to carry the day for all of them. This approach, however, ignores the considerable factual differences between the plaintiffs, even taking the complaint as pled. As discussed in detail below, plaintiffs Dennis, Mather, and Voskoboynikov's allegations belie their assertion that they had "no reason to doubt defendant's intentions to pay them or return their artwork before" the Facebook post in July 2016.

Furthermore, plaintiffs' claimed timing of their injury is intellectually dishonest. According to counsel, if defendant sold their consigned paintings and told plaintiffs so in 2010, they could file a suit to collect the money from the sale of the paintings in 2010, so long as the galleries remained open, notwithstanding their unsuccessful collection efforts all along. Tellingly, plaintiffs cite to no authority supporting this purported view concerning the timing of their injury.

### A. DENNIS' CLAIM IS TIME BARRED.

Dennis alleges that she consigned several paintings to defendant for sale in 2015, one of which defendant sold during exhibition from April through May 2015, and the remainder of which were returned to her possession. She alleges that she sent defendant multiple emails about receiving payment for the sold painting thereafter, which culminated in defendant's offer to pay her in five monthly installment payments of two hundred dollars. Apparently, defendant made the first payment, but falsely represented in an email that he'd mailed her a check for the second payment, which she never received. This prompted her to follow up with defendant in January 2016, to which defendant allegedly responded on January 5, 2016, saying: "yeah

working on it . . . I haven't sold anything in weeks so I don't wanna [sic] send a bad check . . . hopefully this week" (*id.* at ¶¶ 69–77) (ellipsis in original).  It appears that defendant never made any more payments to Dennis thereafter, nor did any further communication between them take place.

Based on the foregoing facts, Dennis knew about the defendant's slow pay or no pay, and even his wire fraud at least as of January 2016.  This is because she never received the check defendant claimed he mailed her, and because, as Dennis herself alleges, defendant's subsequent email constituted an admission that he had not in fact mailed her a check.  It did not take the July 2016 Facebook post to remove the scales from her eyes (in fact, unlike many of the other plaintiffs, Dennis has not even alleged that the viral July 2016 Facebook post was when she first learned of defendant's fraud).  Accordingly, this order disagrees with Dennis' argument that the proper accrual date for her claim should be July 31, 2016.  Dennis knew or should have known of her injury since at least January 2016.  This order finds that her claim is time barred because her complaint was filed on July 30, 2020, more than four years later.

### B. MATHER'S CLAIM IS TIME BARRED.

Similarly, Mather's artist client consigned 36 paintings to defendant in January 2014, sixteen of which defendant sold during exhibition from January through February 2014. Mather alleges that defendant made a partial payment of two thousand dollars in February 2014.  Thereafter, Mather attempted to contact defendant about the remaining payment, each time to no avail.  Eventually, in September 2014, defendant emailed Mather, stating that he was contemplating closing his galleries at the end of that year, claiming that doing so would reduce his overhead cost such that he would be able to pay his debts.  Defendant further stated that: "I would appreciate your discretion on this as I have not told my staff or anyone else yet and I don't need any more rumors flying around right now."

Then, in January 2015, defendant agreed to make monthly installment payments and "repeatedly assured" Mather that the first installment payment would be forthcoming. Subsequently, on February 12, 2015 (*id.* at ¶ 127):

> Defendant told Mr. Mather via email that he had initiated a wire

14

> transfer to Ms. Ploegsma on February 10, 2015. Specifically, he wrote, "I sent it Tuesday, should be there by tomorrow I would imagine. did you get the email from my bank that I sent it?" In fact, when he wrote this email, Defendant had not yet initiated the wire transfer and did not do so until February 16, 2015.

On March 13, 2015 (*id*. at ¶ 128):

> Mather sent an email to Defendant to inquire about the timing of the next installment payment. In response, Defendant wrote, "hey Hyland, hopefully in the next couple weeks... I have a couple openings tomorrow so I might have a better idea after this weekend..."

Incredibly, Mather alleges that it was not until the viral Facebook post on July 31, 2016 — fifteen months after defendant's March 13 email — that he first learned that defendant had no intention of paying him. But Mather's own allegations tell another story. This order finds that Mather had constructive knowledge of his injury dating back to at least March 2015 when defendant stopped making the agreed upon monthly installment payments, especially because the default came more than a year after Mather already knew that defendant had sold the paintings at issue. Indeed, it appears that Mather gained knowledge of defendant's alleged scheme in and around February 2015. For these reasons, Mather's claim began to accrue more than four years before the filing of his complaint and his claim is thus time barred.

### C. VOSKOBOYNIKOV CLAIM IS TIME BARRED.

Again similarly, Vosokoboynikov's claim is also time barred, at least as currently pled. According to the complaint, Vosokoboyniko's artist client consigned several paintings to defendant in 2010, two of which defendant sold during the 2010 exhibition period that Vosokoboynikov knew had sold. Though defendant returned Vosokoboynikov's unsold paintings in 2014, he never paid Vosokoboynikov for the sold paintings. Vosokoboynikov's claim — as well as the civil RICO claim generally — is predicated on the allegation that, in October 2014, defendant falsely represented that he placed a check in the mail when in fact he had not.

Despite the two paintings being sold in 2010 and defendant's allegedly false representation that he placed a check in the mail in 2014, Vosokoboynikov alleges that July 2016 Facebook post is when he first learned of the no pay/slow pay scheme. But

15

Vosokoboynikov should have known of his injury by, at the very least, November 2014. Indeed, by that point, he had learned of the falsity of the very statement that he now complains of as being an act of wire fraud. Thus, to claim that he had no reason to have known anything was amiss prior to July 2016 strains credulity and belies the import of his own allegations.

Accordingly, Vosokoboynikov's claim is also time barred because accrual began more than four years before the filing of his complaint.

*        *        *

Plaintiffs rely heavily upon *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005), contending its facts are directly analogous to our facts. They are not. Here, unlike in *Living Designs*, plaintiffs Dennis, Mather, and Voskoboynikov circumstances demonstrate that they had constructive notice — if not actual knowledge — of defendant's alleged fraud and their individual injuries more than four years before the filing of this action. To the extent that they argue that accrual should begin when they learned — via the Facebook post — that defendant had allegedly defrauded all of them (*i.e.*, of his pattern of racketeering activity), that argument runs head long into *Rotella's* holding that it is the "discovery of the injury, not discovery of the other elements of a claim" that starts the clock. 528 U.S at 553.

In short, as discussed above, Dennis, Mather, and Voskoboynikov had inquiry notice of their individual injuries — as they were not getting paid despite their collection efforts — and knew or should have known that defendant was stiffing them more than four years before they filed this action. Dennis' lack of knowledge of defendant's other alleged acts of wire fraud relating to Mather and Voskoboynikov is not relevant to when she learned of *her own injury*, and vice versa. At best, those details constituted the discovery of "other elements" — *i.e.*, the pattern of racketeering activity — of their RICO claim, the discovery of which does not bear upon accrual.

### D. EQUITABLE TOLLING.

Alternatively, plaintiffs argue their RICO claim should be equitably tolled due to defendant's fraudulent concealment (Dkt. No. 27 at 17–18) (citing Dkt. No. 1 ¶¶ 35–38). To the following extent, this order disagrees.

"To establish equitable tolling, . . . plaintiff[s] must plead with particularity that the defendant actively misled [them], and that [they] had neither actual nor constructive knowledge of the facts constituting [their] RICO claim despite [their] due diligence in trying to uncover those facts." *Evans v. Arizona Cardinals Football Club, LLC*, 761 F.App'x 701, 704 (9th Cir. 2019) (citing *Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996)).

The allegations plaintiffs point to as being sufficient for equitable tolling are general allegations, not specific and particularized (*see* Dkt. No. 1 ¶¶ 35–38). They describe defendant's alleged conduct in general terms, but they do not describe how any individual plaintiff, let alone how Dennis, Mather, and Voskoboynikov, in particular, were actively misled by defendant. Moreover, as already discussed, Dennis, Mather, and Voskoboynikov had at least constructive knowledge of defendant's alleged predicate acts of wire fraud more than four years before the filing of this action. Accordingly, plaintiffs have not pled facts sufficient to justify equitable tolling. In the absence of any tolling, Dennis, Mather, and Voskoboynikov's claims are all time barred.

To be clear, this order makes no finding concerning the timeliness of the other remaining plaintiffs' claims. Though some of their claims appear to be untimely, perhaps they can allege facts establishing tolling. But Dennis, Mather, and Voskoboynikov, who are the only plaintiffs that have supplied predicate acts supporting a RICO claim have not.

## CONCLUSION

To the foregoing extent, defendant's motion is **GRANTED**. There being no federal-question jurisdiction, at least as currently pled, this order will not extend supplemental jurisdiction to reach plaintiffs' state-law breach of fiduciary duty claim and defendant's arguments raised thereto. Conceivably, there are a set of facts that plaintiffs could plead to remedy the deficiencies identified herein. Accordingly, plaintiffs are invited to move for leave to amend their complaint by **FEBRUARY 11, 2021, AT NOON**. Plaintiffs must plead their best case. Their motion must affirmatively demonstrate how the proposed amended complaint corrects the deficiencies identified in this order, as well as any other deficiencies raised in

defendant's motion, if at all, but not addressed herein. The motion should be accompanied by a redlined copy of the amended complaint.

**IT IS SO ORDERED.**

Dated: January 26, 2021.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

18